**William F. BUCKLEY, Jr., et al.,**
**Plaintiffs-Appellees,**
**v.**
**AMERICAN FEDERATION OF TELE-**
**VISION AND RADIO ARTISTS,**
**Defendant-Appellant,**
**National Labor Relations Board and American Civil Liberties Union,**
**Amici Curiae.**

**No. 81, Docket 73-1667.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 7, 1973.

Decided April 30, 1974.

C. Dickerman Williams, Baker, Nelson & Williams, New York City, John L. Kilcullen, Edith D. Hakola, Washington, D. C. (District of Columbia Bar), for plaintiffs-appellees.

Alexander M. Bickel, New Haven, Conn., Mortimer Becker, Edward Schlesinger, Robert M. Jaffe, New York City, for defendant-appellant.

Glen M. Bendixsen, Chief, Spec. Litigation, Stephen C. Yohay, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliot Moore, Asst. Gen. Counsel, for N. L. R. B.

Melvin L. Wulf, New York City, for American Civil Liberties Union.

Before WATERMAN, FRIENDLY and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal by the labor organization, American Federation of Television and Radio Artists (AFTRA) from an order entered in the United States District Court for the Southern District of New York, declaring, in part on constitutional grounds, that any provision of any collective bargaining agreement "requiring, or purporting to require, that [appellees William F. Buckley, Jr. and M. Stanton Evans] continue to be members of [appellant union, American Federation of Television and Radio Artists], pay dues to [appellant union] and/or comply with [appellant union's] orders and regulations, as a condition of" appearing on radio or television in their roles as paid commentators on public affairs is "void and of no effect." Insofar as the appellees' responsibility to tender periodic dues to the union is nullified by the judgment below, we reverse on the merits. Moreover, inasmuch as we hold that the district court was without jurisdiction to adjudicate the other issues raised by the appellees' complaints, which pertained to compulsory union membership and to compulsory compliance with union orders and regulations, we also reverse the remaining portions of the district court's judgment.

With great care the district court accurately set forth the specific facts and circumstances from which this litigation arose. See 354 F.Supp. at 826–836. No useful purpose would be served by a detailed repetition of the presentation so articulately and comprehensively set forth in the opinion below. Moreover, the relative narrowness of the decision we reach today renders immaterial for our purposes much of the factual background developed by the district court. We shall therefore confine our discussion of the facts to those which are within the ambit of the limited role we think a federal court can play in this dispute at the present time.

Both appellees are well-known articulate exponents of a "conservative" political philosophy. They are engaged in a plethora of activities, amongst which are regular appearances on radio and television. Mr. Buckley is the host of his own television program, "Firing Line," in which he usually engages in spirited argument guest spokesmen of "liberal" persuasion. Mr. Evans appears as a participant on the CBS radio series "Spectrum," a program in which on a regular basis a number of spokesmen for differing political and social philosophies express their opinions on topics of their own choosing.

The employing parties with whom Buckley and Evans negotiated their contracts of employment have collective bargaining agreements with AFTRA. These latter agreements, by incorporation of the union's "Code of Fair Practice," obligate the employers to employ only members of AFTRA or persons who become members of AFTRA within thirty days after the commencement of the employment relationship. This "union shop" provision is authorized, but not required, by Section 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(3), which reads:

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later. * * * *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

In addition, the union's constitution purports to impose upon its members responsibilities to the union in excess of those contemplated by § 8(a)(3). For example, Article XVIII, Sec. 1 of the AFTRA Constitution describes the punishments to which a union member is subject for failure to fulfill those responsibilities:

Any member who shall be guilty of an act, omission, or conduct which in the opinion of the Board is prejudicial to the welfare of the Association, or of any of its Locals, or of any of its members, as such, or any member who shall fail to observe any of the requirements of the Constitution, or of any By-Laws, rules, regulations or orders lawfully issued by the Association, any Local or any duly authorized committee or agent of said Association or Local, or any member who shall in any way be indebted to the Association or any Local thereof, may, in the discretion of the Board, be either fined, censured, suspended or expelled from membership. . . .

In their complaints in the district court the appellees challenged alleged requirements allegedly imposed upon them, that they be members of the union, that they pay dues to the union, and that they comply with all union orders and regulations. They claimed that these requirements which they allege were sought to be imposed upon them by the union constituted unreasonable re-

straints on the right of free speech and deprived them of their property without due process of law. The imposition of these requirements was asserted to have been "accomplished by the defendant AFTRA acting under the authority of the National Labor Relations Act."

As we have already stated, the expansive relief granted by the district court absolved appellees from union membership, from paying dues, and from complying with union regulations. For reasons that appear *infra* we hold that as to the issues of compulsory membership and compliance with union regulations, the National Labor Relations Board ("NLRB") had primary jurisdiction under the preemption principle of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Thus we hold that the federal district court exceeded its power in deciding these two issues, and we do not reach the merits with respect to them. Regarding the dues requirement, however, we do reach the merits and hold, contrary to the result reached by the district court, that this requirement does not abridge appellees' first amendment right of free speech.

■■ It is elementary constitutional doctrine that the first amendment only restrains action undertaken by the Government. Railway Employes' Dep't v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); Linscott v. Millers Falls Co., 440 F.2d 14 (1 Cir.), cert. denied, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed. 2d 116 (1971). There is, however, a crucial corollary to this rudimentary tenet. When private action becomes imbued with a governmental character, or when the Government significantly insinuates itself into the operative activities of private parties, then action by private parties may be regarded as "state action" and, if so, will be subject to all the constitutional limitations on governmental action. Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.

Ed.2d 373 (1966); Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Here it is alleged that the requirement found in the AFTRA Code of Fair Practice that dues be paid is "accomplished by the defendant AFTRA acting under the authority of the National Labor Relations Act." It is true that § 8(a)(3) expressly authorizes union shop agreements which may require that employees pay union dues. The section also specifically permits the discharge of an employee who fails to comply with such a dues requirement. Appellees contend that this congressional authorization makes a union shop provision contained in a collective bargaining agreement negotiated between private parties "state action." In support of this contention, appellees rely primarily on Railway Employes' Dep't v. Hanson, *supra*, and Linscott v. Millers Falls Co., *supra*. In Railway Employes' Dep't, the Supreme Court held that the Railway Labor Act provision comparable to § 8(a)(3) of the National Labor Relations Act transmutes otherwise private union shop agreements into "governmental action." The Railway Labor Act, however, explicitly provides that union shops are permissible despite any state law that would otherwise prohibit them, whereas Section 14 of the NLRA, on the other hand, declares that a state "right to work" law forbidding union shops will not be superseded by § 8(a)(3). However, the First Circuit in Linscott v. Millers Falls Co., *supra*, quoting Railway Employes' Dep't v. Hanson, *supra* at 232, ascribed little significance to this distinction between the two labor statutes, and found that a union shop agreement under the NLRA constituted government action because "the federal statute is the source of the power and authority by which any private rights are lost or sacrificed." 440 F.2d at 16. Appellees would have us adopt this reasoning, and after first holding that the union shop agreement is subject to constitutional scrutiny, then proceed to rule in their

favor by holding that the dues requirement violates the first amendment.[1]

In order to establish jurisdiction to reach the merits of this first amendment claim, it might at first blush appear we must resolve the "government action" issue. But this is not necessarily so.

The line between a jurisdictional issue unrelated to the merits of an action and one which depends upon adjudication of the ultimate merits of a case is sometimes a fine line. In fact, many jurisdictional problems cannot be unqualifiedly inserted into one category or the other. It often is difficult to resolve jurisdictional issues without, in effect, reaching determinations on the merits. See, e. g., Comment, 47 N.Y.U.L.Rev. 349, 354 (1972). In Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the Supreme Court sought to alleviate some of these conceptual incongruities by developing a practical approach. This approach allows a federal court to assume jurisdiction over an action alleging violation of the U.S. Constitution if satisfied by an initial cursory examination that there is, on the merits, a justiciable issue. In Bell the plaintiffs sought money damages from the defendants, Federal Bureau of Investigation agents, who were alleged to have improperly searched the plaintiffs' premises and to have falsely imprisoned the plaintiffs in derogation of their fourth and fifth amendment rights. The defendants argued that the fourth and fifth amendments represent proscriptions "against the federal government as a government" and could not support a damage suit against particular government employees for allegedly violating those proscriptions. The Court approached the issue of whether such a suit, bottomed upon alleged violations of constitutional limitations, was maintainable—an issue somewhat analogous to the issue of whether a suit alleging violation of the first amendment can be maintained against the private party, AFTRA, here. In Bell the Court held that, in the circumstances there alleged, federal jurisdiction to adjudicate the plaintiffs' claims on the merits could be defeated only by a showing that an alleged violation of the Constitution is really immaterial to the practical resolution of the litigation and was raised solely for the purpose of achieving jurisdiction, or by a showing that the claim is wholly insubstantial and frivolous. Id. at 682–683.

■ So here, when we apply the practical test of Bell, we conclude, without having to decide the issue of whether AFTRA's dues requirement is "government action," that the district court had jurisdiction to adjudicate the appellees' claims that AFTRA's dues requirement impinges upon appellees' first amendment rights. First of all, the constitutional claim is neither "immaterial" nor presented "solely for the purpose of obtaining jurisdiction." More importantly, although the government action aspect of the claim may be a close question, the claim is not an insubstantial or frivolous one. Indeed, the contrary is true. For instance, an examination of the contrasting views expressed in the majority and concurring opinions in Linscott v. Millers Falls Co., supra, convinces us that the claim appellees here assert under the Constitution is not made insubstantial and frivolous because of its "government action" aspect.

Having established that we have jurisdiction to decide whether AFTRA's requirement that appellees pay its prescribed dues violates appellees' first amendment rights, we hold there is no violation. In so deciding, we do not need to reach the issue of whether government action is involved. We conclude that even if it were, which we do not intimate, the dues requirement is not constitutionally infirm.

---

1. The Tenth Circuit disagrees with the First and has held that § 8(a)(3) does not render union shop agreements "government action."

Reid v. McDonnell Douglas Corp., 443 F.2d 408, 409–411 (10 Cir. 1971).

■ Acts of speech and of expression, although protected by the first amendment, are not so exalted that they can never be, even indirectly, obstructed. Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Indeed, even with reference to freedom of the press, the Supreme Court has recently reaffirmed what has long been understood to be the law: "[O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed." Branzburg v. Hayes, 408 U.S. 665, 682–683, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972). More specifically, where there is a proper governmental purpose for imposing a restraint and where the restraint is imposed so as not to "unwarrantedly abridge" acts normally comprehended within the first amendment, there is no abridgment of first amendment rights. Cox v. New Hampshire, *supra* at 574. Nor is there any abridgment of first amendment rights arising from the congressional authorization granting a union the power to collect dues from employees in a "union shop." The congressional purpose in authorizing mandatory union dues is surely a permissible one, for Congress was understandably concerned with minimizing industrial strife and thereby insuring the unimpeded flow of commerce. It was the legislative judgment that these goals are most easily realized if a suitable collective bargaining apparatus exists, see, e. g., International Association of Machinists v. Street, 367 U.S. 740, 760, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and so the national labor laws provide for an exclusive bargaining agent to represent each discrete employee bargaining unit. See, e. g., § 9(a) of the NLRA, 29 U.S.C. § 159(a). To enable these agents to fulfill their statutory responsibility to represent all the employees while collectively bargaining with the employer, the statutes permit the levying of mandatory dues on all employees who will reap the benefits of the union's representation of them in the contract negotiations with the employer. A required tolerance of "free riders," i. e., those who enjoy the benefits of the union's negotiating efforts without assuming a corresponding portion of the union's financial burden, would result not only in flagrant inequity, see, e. g., NLRB v. General Motors Corp., 373 U.S. 734, 740–743, 83 S. Ct. 1453, 10 L.Ed.2d 670 (1963); Radio Officers' Union v. NLRB, 347 U.S. 17, 41, 74 S.Ct. 323, 98 L.Ed. 455 (1954), but might also eventually seriously undermine the union's ability to perform its bargaining function. It is thus manifest that the statutory treatment of mandatory union dues serves a "substantial public interest."

■ Moreover, we find that the means adopted to achieve this proper purpose of reducing industrial strife are reasonable, and do not "unwarrantedly abridge" free speech. The dues here are not flat fees imposed directly on the exercise of a federal right. See Murdock v. Pennsylvania, 319 U.S. 105, 113–114, 63 S.Ct. 870, 87 L.Ed.2d 1292 (1943). To the contrary, assuming *arguendo* that government action is involved here, the dues more logically would constitute the employee's share of the expenses of operating a valid labor regulatory system which serves a substantial public purpose. If there is any burden on appellees' free speech it would appear to be no more objectionable than a "nondiscriminatory [form] of general taxation" which can be constitutionally imposed on the communication media. Branzburg v. Hayes, 408 U.S. 665, 683, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Grosjean v. American Press Co., 297 U. S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

■ Appellees also contend that they did not seek, and do not desire, to be represented by the union and that as they have not derived any substantial benefit from the union's representation they are not "free riders." The district judge accepted this contention, and although he found that the appellees derived some benefit from their memberships in union pension plans, he regarded this as not being substantial enough

to make the appellees "free riders." We disagree with the district court. There is no rational basis for distinguishing between the degrees of benefit one enjoys as a result of a union's bargaining efforts on his behalf.[2]

Turning now to the allegations that on pain of loss of employment the requirements of compulsory union membership and compulsory compliance with union regulations also violate the constitutional rights of plaintiffs to be employed by the media, we hold that the district court did not have jurisdiction to adjudicate these matters. Although appellees' complaints do not explicitly allege violations of §§ 8(a)(3) and 8(b)(2),[3] they do aver the commission of acts which we find are "arguable" unfair labor practices under those sections of the NLRA. When unfair labor practices are alleged "the federal courts must defer to the exclusive competence of the National Labor Relations Board." San Diego Building Trades Council v. Garmon, *supra* at 245; accord, Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

Both Buckley and Evans claim that they have not only been compelled to pay dues to the union but have also been "required" to join the applicable local organization and to comply with union rules and regulations.[4] The union does not deny that its representatives informed Buckley that the ultimate penalty for failing to remain a "full-fledged" member would be his discharge from employment. It is abundantly clear that an "arguable" unfair labor practice would result if the union should carry out this threat.[5] Buckley apprises

---

2. Of course we do not decide whether employees who have derived *no* demonstrable benefit from a union's efforts are "free riders."

3. Such allegations are unnecessary.
   Assuredly the proposition that Lockridge's complaint was not subject to the exclusive jurisdiction of the NLRB because it charged a breach of contract rather than an unfair labor practice is not tenable. Pre-emption, as shown above, is designed to shield the system from conflicting regulation of conduct. It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern. Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 292, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

4. The imposition of the "requirements" of membership and compliance with union rules is, as we shall demonstrate, conduct by which the union *arguably* violates § 8 of the National Labor Relations Act. As such, it is subject to the preemptive jurisdiction of the NLRB, San Diego Building Trades Council v. Garmon, supra. Abstention by the federal district courts is necessary to prevent "conflicting regulation of conduct." Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, supra at 292. The dues requirement which we have already considered stands on a different footing, however. Not only is that requirement not arguably violative of § 8, as it must be for the jurisdiction of a federal district court to

be preempted, it is incontestably *authorized* by that section. Deferring to the NLRB on the dues question is thus mandated neither by the *Garmon* test itself nor by the *Garmon* philosophy of fostering uniform and consistent treatment of the modes of conduct that Congress has sought to prohibit in § 8 of the National Labor Relations Act.
   Furthermore, our retention of jurisdiction over the dues claim does not render this case a proper occasion for the invocation of the doctrine of pendent jurisdiction. Application of the doctrine is discretionary, Winnick v. Manning, 460 F.2d 545, 550 (2 Cir. 1972); C. Wright, The Law of Federal Courts § 19, at 64 (2d ed. 1970), and seems particularly inappropriate under the circumstances here where the membership and rules compliance issues are distinct from the dues claim, and do not constitute alternative theories on the same pivotal facts as the dues claim, and where the judicial and legislative policy favoring uniform treatment of conduct arguably constituting unfair labor practices demands that one specialized agency, the NLRB, assume the principal responsibility for shaping the law.

5. See NLRA §§ 8(a)(3), 8(b)(2), 29 U.S.C. § 158(a)(3), (b)(2); NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 197 n. 37, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Indeed, in its brief, and at oral argument in this court the union concedes that "the imposition of obligations of membership other

us that he refrained from resigning from the union because he feared that he would suffer loss of media employment and also incur the significant hardships that would undoubtedly accompany such a discharge.[6] Buckley's decision not to resign was not an unreasonable decision, and it did not bar him from seeking declaratory relief. But inasmuch as the union conduct to which Buckley objects constituted arguable unfair labor practices, his selection of forum was incorrect. He should have taken his cause to the National Labor Relations Board, an administrative agency fully capable of granting declaratory relief to him if circumstances warrant such relief. See 5 U.S.C. § 554(e).

The only oral representations made to Evans were those made by his prospective employer. The substance of these remarks was that before Evans could appear on the "Spectrum" Radio Series, Evans had to join the union because the employer's collective bargaining agreement mandated it. It also seems that Evans, as well as Buckley, believes that the requirements of compulsory membership, and the duty to comply with union rules and regulations, are imposed on him by the combination, on the one hand, of § 84 of AFTRA's Code of Fair Practice to which Evans's employer is subject under the collective bargaining agreement it has with AFTRA, and, on the other, Article XVIII of the AFTRA Constitution, to which Evans himself would appear to be subject as a "full-fledged" member of the union. Section 84 is the compulsory unionism clause, i. e., the provision obligating the employer to employ only those persons who are AFTRA members in good standing, or those who become such AFTRA members within thirty days of the inception of the employment relationship. Article XVIII of the AFTRA Constitution, quoted *supra*, gives the union the power to expel from membership any member who "shall fail to observe" any union rule or regulation. At first glance, the union would seem to have attempted to reserve to itself the power to force an employer to discharge an employee by the simple expedient of expelling the employee from union membership for

---

than dues-payment will depend on continued full-fledged membership, which . . . cannot be imposed on pain of loss of employment."

The union also acknowledges that Buckley and Evans can avoid any other sanctions which the union might seek to impose on them by resigning from "full-fledged membership while continuing to pay dues." The union attempts to qualify this concession, however, by noting that "whether Buckley and Evans can freely exercise [the right to resign from full-fledged membership] depends on circumstances." The union's assumption that Buckley and Evans can currently be considered "full-fledged" members is suspect. At least in Buckley's case, the misrepresentations made to him that to retain his employment he was required to be and to remain a full-fledged AFTRA member appear to be sufficient to vitiate any "consent" he may have given to becoming and remaining a full-fledged member. Sheraton-Kauai Corp. v. NLRB, 429 F.2d 1352, 1357 (9 Cir. 1970).

As to whether there are issues of arguable unfair labor practices, we would point out that the union may have already violated § 8(b)(1) of the NLRA by "coercing" Buckley, and possibly Evans, into becoming full-fledged members of the union. Under § 7 of the Act, Buckley apparently had the right to refrain from becoming a full-fledged member. The union's misrepresentations to him regarding his obligations to the union appear to have effectively coerced Buckley into incurring responsibilities he was not required to accept. Coercion may be "inferred" from the success of these misrepresentations. Sheraton-Kauai Corp. v. NLRB, supra at 1357.

6. We note that the appellees' right to continued media employment will not be endangered should they seek to crystallize their controversies with the union by resigning from full-fledged union membership. As long as they forward dues to the union they, through NLRB intervention, should be able to obtain a federal district court injunction against their discharge from employment, see 29 U.S.C. § 160(j), pending disposition of any litigation which might follow resignations. A threat of irreparable injury would exist, and, as we have explained, and as the union has conceded, there would be an excellent chance that Buckley and Evans would succeed on the merits of a claim that the payment of dues is a sufficient compliance.

any real or imagined infraction of its rules or regulations. On the other hand, §§ 8(a)(3) and 8(b)(2)'s substantial limitation on the ability of the union to so affect the employment relationship appears to receive implicit recognition in § 84 itself, which provides for automatic amendment of the section if the NLRA should be "repealed or amended so as to permit a *stricter* union security clause (emphasis added)." Evans's case is distinguishable from Buckley's case in that Evans's case relies principally on these broad union-drafted documents rather than on the highly specific warnings Buckley received. However, in any event, it is the function of the NLRB to ascertain whether Evans's controversy is sufficiently developed to enable it to declare the rights of the parties, and, if the controversy has so evolved, whether the union commits or would commit unfair labor practices by indulging in the conduct about which Evans is apprehensive.

Reversed and remanded.

FRIENDLY, Circuit Judge (concurring):

I concur in the result and in the majority's holding that § 8(a)(3) is constitutional insofar as it permits a union to require employees in a union shop to pay ordinary dues and fees even if the employees are radio and television commentators. However, I disagree that the issues of compulsory membership and compliance with union regulations, as presented on this appeal, fall within the exclusive jurisdiction of the National Labor Relations Board. The appellees sought a declaratory judgment that AFTRA's union security agreement, authorized by § 8(a)(3) of the Act, violated their constitutional rights, in part because it would expose them to union discipline and require them to become union members. Federal courts must give way to the National Labor Relations Board when the claim is that the conduct in question violates the unfair labor practice provisions of the NLRA. And to the extent that the appellees contend that the union would be committing an unfair labor practice by imposing fines or otherwise disciplining them, I agree that their claim is preempted. However, the real thrust of appellees' argument seems rather to be that the Act authorizes the union to discipline them and is therefore unconstitutional. Since the preemption doctrine does not extend to constitutional attacks on the National Labor Relations Act, see Seay v. McDonnell Douglas Corp., 427 F.2d 996, 1002–1004 (9 Cir. 1970); Lewis v. AFTRA, 71 Misc.2d 253, 336 N.Y.S.2d 56 (Sup.Ct.1972), aff'd, 41 App.Div.2d 707, 341 N.Y.S.2d 625 (1st Dep't 1973), the district court's jurisdiction over the constitutional claims in this case was not preempted. However, as the court points out in footnote 5, and as the union concedes, an employee under the union shop provision of the Act need not accept "full-fledged" membership in the union, and thus can avoid the disciplinary sanctions to which "full-fledged" members may be subjected. Under this construction, I see no constitutional infirmity in § 8(a)(3) even as applied to persons whose First Amendment protection is of peculiar importance.