1128

Robert PRICE, Timothy Sullivan, Richard R. Caffary, Robert J. Eusebio, Donald Raffo, Deloris Blanco, Dianne E. Martin, Arthur P. Vine, James Q. Ryley, Donald L. Brown, Ben J. Edwards, Jr., Alder K. Muttart, Samuel W. Holdridge, Douglas A. Gilleo, Ellen W. Morris, Gustave P. Brucker, III, Gilbert E. Dionne, Robert L. Martin, Mrs. Linda L. Orr, Thomas Raymond Briggs, Fred W. Taylor, Ernest Vetelino, Jr., Robert M. Maloney, Henry Kosycarz, William E. Oberlin, Willie H. Esters, Marilyn M. Flaherty, Thelma B. Olsen, Lena M. Lo Gioco, Victor Angelini, Robert E. Plebiscito, Bonnie-Jean Jackett, Alfred Rogers, Robert J. Martin, Theresa R. Weiss, Doreene De Noto, Richard C. Niles, Donald R. Reuss, Jr., Jeanne W. Lamperelli, Cathleen M. Donacki, Paul F. Brown, Anthony J. Pupillo, Thomas J. Gomes, Alan G. Livingstone, Clyde W. Phelps, Dudley E. Harris, Jack H. Corey, Joan R. Boiselle, Irving Matchen, Frederick H. Silvavec, Gregory T. Marney, Richard Zelinski, Nancy Parvin, Clement R. Pitts, Kenneth Ferria, Barbara D. Dimmons, Charles P. Crandall, III, Marthe M. Founier, John R. Radley, Arthur F. Cordes, Donna M. Padula, Robert G. Delicato, Thomas L. Borgman, Gary C. Peltier, Robert M. Bullock, Samuel A. Adams, James T. Kearney, Salvatore M. Grills, Peter N. Turco, Harold G. Joseph, Thomas Schneider, Ernest L. Le Beau, Beresford B. Cooper, Marlene A. Mikulka, Nancy M. Gross, Thomas L. Theroux, Kristine Kozlicky, Francis X. Walters, Timothy S. Bevins, Louisa Beverly Lopes, Lori J. Obymako, Thomas L. Clary, Denise M. Brault, Jeffery A. Mohnkern, William S. Portellos, Lenwood T. Robins, James A. Martin, John Patrick Walsh, Kenneth H. Jodry, Reginald V. Young, Randolph Cox, Martine A. Flory, Frank Savona, Bobby G. Simmons, Sr., Chrisy J. Enos, Jr., Christine Buffon, Maurice M. Beebe, Jr., Linda R. McCoy, Laurie Brown, George A. Enos, Jr., Tammy L. Young, Linda J. Larson, Mildred A. Gula, Gerald N. Chenail, Claude C. Carlson, Robert L. Donover, Mary R. Hill, Thomas F. Edwards, Jr., D.S. Richardson, III, Michael E. Southwood, Rudolph D. Burdick, Gilvert H. Davis, Andrew M. Rees, Jr., Christine A. Lopez, John E. Barrett, Jr., Pamela Kelly, Howard F. Stillwell, Mary Deborah Marshall, Nancy Lee, Arline M. Brown, Joan M. Jones, Denise M. Peltier, Robert Pesapane, Pamela Springer, Eric Hinz, George W. Mach, Harold J. Smith, Paul G. Way, Guido Ciacci, Charles Granville, Tina Marie Blais, Dana W. Vigue, Rene S. Marcu, Delmar G. Cherry, James H. Hope, John P. Ward, Gerard J. Morrone, Mark F. Walter, Anita Andrelli, Michael Maglio, Warren Lewis, Eileen Pupillo, Alycia F. Limson, Frank B. Thackeray, Gale E. Franklin, Bruce H. Burnham, Virginia K. Cleary, Mabel J. Hull, Bruce Foster, Melvin T. Reagan, Jeffrey L. Straw, David M. Seibert, Brinton W. Turner, III, Grant J. Bombria, Michael F. Cipriani, Robert P. Thompson, Lawrence J. Mellow, Christopher M. Venanzio, Michele M. Williams, Patricia A. Koonce (Robbins), Scott Laporte, Rose E. Walsh, Walter L. Wooten, Herbert Kane, Raymond A. Hamilton, Jr., Daniel J. Freiert, Cynthia L. Slack, Sally R. Perkins, David Godin, Karen Barthelson, Paul H. Hunton, William Mease, Delores Jean McPherson, Nancy E. Stumpo, Estelle T. Chabot, Walter Ignatowich, Herbert O. Sturman, Claude P. Hoffman, Beverly A. Degaetano, John J. Salveggio, Robert C. Olsen, Albert A. Ferris, Janice M. Williams, Esther T. Pepin, Walter E. Harrington, David C. Kingsborough, David Duffy, Richard J. Bedard, Patricia A. Rossi, Malone S. Jones, David J. Gonsalves, Edward J. King, Theodore G. Brassard, John A. Skinner, Paul Whitehead, Douglas G. Evans, Leonard J. Bachman, Grace E. Kenyon, Gina Lakestream, Elanie W. Jones, John S. Hammett, James R. Hall, Frederick Cooney, Patricia A. Wright, Harold Chappell, Robert J. Urban, Mark E. Allard, Donald A. Ciccone, Devin Thomas Bentley, Constance Horner, Michael Giordano, Paul G. Way, Gloria C. Jackson, Russel V. Barth, Gerald J. Arpin, Virgin G. Lee, Christopher J. Peters, Richard J. Perras, Lawrence J. Morth, Roger F. Harrington, Clifford F. Schultz, Gerald F. Rogers, Jeffrey M.

Aptt, John Soda, Paul E. Maynard, George Guido Gargano, Ola R. Larson, Joanne Sisco, Gary J. Vargas, Raymond J. Caviggia, Philip E. Rathbun, William M. Fiske, Helen E. Kenneth, Judith A. Lamperelli, Joy Pendergraft, William Synan, Ronald G. Shaw, Anthony Salafia, Harry W. Wheeler, John J. Woomer, Jr., Angelo J. Dimarco, William R. Burris, James H. Andrews, Donald G. Maxson, Jr., Sandra L. Way, Scott Champlin Burbank, Charles J. Howard, Jr., Kenneth W. Drennen, Helenia M. Ilvento, Rosmary J. Jette, Laurie Ann Bowski, Frances L. Bumbert, Plaintiffs-Appellants,

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE and AGRICULTURAL IMPLEMENT WORKERS of AMERICA; Marine Draftsmen Association, Local 571, UAW, AFL–CIO and Electric Boat Division, General Dynamics Corporation, Defendants-Appellees.

No. 192, Docket 85–7408.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 1985.

Decided July 16, 1986.

Edward F. Hughes, North Springfield, Va. (Center on Nat. Labor Policy, Inc., of counsel), for plaintiffs-appellants.

Lawrence Gold, Washington, D.C. (James Coppess, George Kaufmann, Washington, D.C.; Jordan Rossen, Michael Nicholson, Detroit, Mich., of counsel), for defendants-appellees.

Before CARDAMONE, PRATT, and MINER, Circuit Judges.

## GEORGE C. PRATT, Circuit Judge:

Alleging violations of their first amendment speech and associational and fifth amendment due process rights, as well as a breach by their union of its duty of fair representation, appellants sought relief from paying full dues and fees under a union security clause contained in the collective bargaining agreement between their employer and their union. The district court denied appellants' request for a preliminary injunction, finding that they had failed to show either irreparable injury or likelihood of success on the merits. Following this, appellants and the union each moved for summary judgment, and the employer moved to dismiss for failure to state a claim. The United States District Court for the District of Connecticut, M. Joseph Blumenfeld, *Judge*, granted the union's motion for summary judgment and the employer's motion to dismiss, and denied appellants' motion for summary judgment. We affirm the judgment of the district court, although for a different reason with respect to the duty of fair representation claim.

### BACKGROUND

Appellants are employees of General Dynamics Corporation, Electric Boat Division, located in Groton, Connecticut, and are members of a bargaining unit of clerical and technical workers represented by the Marine Draftsmen Association, Local 571, UAW, AFL–CIO. Their allegations against their employer, their local union, and their international union arise out of a "union security", or "union shop", clause contained in the collective bargaining agreement negotiated between the employer and the union. Under this union security clause appellants, as members of the bargaining unit, were required, within 31 days after their employment commenced, to join the union and pay an amount equal to the union's initiation fee and, thereafter, monthly dues.

Shortly after the collective bargaining agreement was executed appellants informed the union that they wanted a percentage reduction in their dues and fees because they objected to paying for political and ideological causes supported by the union. They claimed that those expenses were unrelated to the union's role as collective bargaining representative. Appellants contended that the forced payment of the full amount of dues and fees violated their first amendment speech and associational rights and their fifth amendment due process rights, and constituted a breach of the union's statutory duty of fair representation. Moreover, they asserted that the procedure prescribed by their international union to rebate dues and fees expended for political purposes was inadequate.

Pursuant to the collective bargaining agreement, the union warned appellants that it would seek their discharge if they failed to pay in full, and the employer, as it was contractually obligated to do, notified appellants that they would be terminated for nonpayment. Rather than risk discharge, appellants have paid their dues and fees in full pending resolution of this litigation.

### DISCUSSION

#### A. *Appellants' Constitutional Claims.*

The viability of appellants' first and fifth amendment claims hinges upon the existence of government action, often called "state action", for without it, the union shop clause would be simply the product of negotiations between private parties. "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The district court rejected appellants' assertion that, like section 2, Eleventh of the Railway Labor Act, 45 U.S.C. § 152, Eleventh (1982), section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1982), establishes the requisite government action to support their constitutional

claims. *See Price v. International Union,* 621 F.Supp. 1243, 1248–49 (D.Conn.1985). We agree with the district court that government action is absent here.

Appellants, whose labor relations are governed by the National Labor Relations Act (NLRA), rely heavily on *Railway Employes' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), and a subsequent line of cases decided under the Railway Labor Act (RLA), *see International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Brotherhood of Railway and Steamship Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *see also Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), for their claim that government action exists here.

*Hanson* involved a suit by railroad employees alleging violations of their first and fifth amendment rights and seeking to enjoin their employer and several unions from enforcing a union shop agreement. Writing for the Court, Justice Douglas noted that the RLA had been amended to allow for the inclusion of union shop agreements notwithstanding the contrary law of any state. 351 U.S. at 228–31, 76 S.Ct. at 716–18. Section 2, Eleventh of the RLA provides, in pertinent part:

Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become

members of the labor organization representing their craft or class * * *.

45 U.S.C. § 152, Eleventh (1982). As this provision offered a means to override the law of 17 states at the time—including that of Nebraska, which had a right-to-work law inconsistent with § 2, Eleventh—the *Hanson* Court found government action. 351 U.S. at 232, 76 S.Ct. at 718. "If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded. * * * The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." *Id.* Nevertheless, despite the presence of government action, the *Hanson* Court found no impairment of first or fifth amendment rights in the mere inclusion of a union shop clause, although the Court left open the question of whether the imposition of other conditions would invade protected rights. *Id.* at 238, 76 S.Ct. at 721.

*Street* and *Allen* probed beyond the *Hanson* Court's approval of the facial validity of § 2, Eleventh, by addressing specific challenges to the use of dues to support political purposes. *See Street,* 367 U.S. at 742–46, 81 S.Ct. at 1786–88; *Allen,* 373 U.S. at 115–18, 83 S.Ct. at 1160–62. In both instances, the Court did not base its decisions on the constitution, but relying on the statute, § 2, Eleventh, denied the union the right to use dues for such purposes against a member's wishes. *Street,* 367 U.S. at 768–69, 81 S.Ct. at 1799–1800; *Allen,* 373 U.S. at 118 & n. 5, 83 S.Ct. at 1162 & n. 5. In *Ellis,* airline employees objected to paying that portion of their dues that related to expenditures by their union for conventions, litigation unrelated to collective bargaining, union publications, social functions, and union organization. 104 S.Ct. at 1888. The *Ellis* Court held that the expenditures for conventions, social functions, and publications were authorized by the RLA, but that the costs of organizing efforts and litigation unrelated to col-

lective bargaining were outside the authorization of the RLA. *Id.* at 1892–97.

■ Appellants here contend that government action is present whenever congress authorizes the use of union security agreements, and argue that § 2, Eleventh, as interpreted in *Hanson* and its progeny, is indistinguishable from § 8(a)(3) of the NLRA. There, congress directed that:

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein * * *.

29 U.S.C. § 158(a)(3) (1982). Appellants would have us analogize this provision of the NLRA with § 2, Eleventh of the RLA on the ground that both do no more than authorize the use of union shop clauses. We note that we have previously declined to decide whether there is a distinction for purposes of government action between § 8(a)(3) and § 2, Eleventh. *See Buckley v. American Federation of Television and Radio Artists,* 496 F.2d 305, 309–10 (2d Cir.), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974).

The fourth circuit, in *Beck v. Communications Workers of America,* 776 F.2d 1187, 1197–98 (4th Cir.1985) (*pet. for reh'g in banc granted*), recently sought to harmonize the construction of these two statutes, stating: "As is obvious, it would be difficult, if not impossible, to find two statutes more identical in language and legislative purpose than section 8(a)(3) of the NLRA and section 2, Eleventh of the RLA." *Id.* at 1197. We respectfully disagree with the *Beck* majority's analysis of this issue.

The Supreme Court has enunciated the following approach for analyzing whether government action exists:

First, the deprivation [of a federal right] must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. * * * Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753. Recognizing that the RLA's preemption of contrary state law was the heart of the *Hanson* Court's finding of government action, the District of Columbia circuit, in *Kolinske v. Lubbers,* 712 F.2d 471 (D.C.Cir. 1983), emphasized that:

Because the federal statute did more than merely authorize the use of a union shop clause and allowed a private agreement to override contrary state law, the constitutional deprivation alleged by the plaintiff in *Hanson* was caused by the exercise of some *right or privilege* created by the government.

*Id.* at 476 (citing *Lugar,* 457 U.S. at 936, 102 S.Ct. at 2753). The NLRA, however, contains no similar preemption of state law, *see id.;* rather, the NLRA is merely permissive because it does no more than authorize a union shop in the *absence* of contrary state law, *see Reid v. McDonnell Douglas Corp.,* 443 F.2d 408, 409–11 (10th Cir.1971). Section 14(b) of the NLRA expressly recognizes that states may preclude that statute's union shop authorization by contrary legislation. *See* 29 U.S.C. § 164(b) (1982).

The *Beck* majority reasoned, however, that there is no distinction on this ground because an agency shop clause under either statute is necessarily permissive insofar as it cannot exist without the agreement of the parties. 776 F.2d at 1206; *see also Linscott v. Millers Falls Co.,* 440 F.2d 14, 16 (1st Cir.) ("If federal support attaches to the union shop if and when two parties agree to it, it is the same support, once it attaches, even though the consent of a

third party, the state, is a pre-condition"), *cert. denied,* 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971).

Although it is true that a union security clause cannot exist absent agreement by the parties, that is not determinative of the existence of government action, for the critical distinction is that, given that agreement by the parties is a prerequisite under both statutes, the states are precluded from outlawing union shops under the RLA and are not similarly precluded under the NLRA. By authorizing the inclusion of union shop clauses subject to the whim of the states, the NLRA allows private parties to do nothing more than what they could have agreed to do without the NLRA. The RLA, on the other hand, goes further and creates a federal right or privilege that enables private parties to override state right-to-work laws. "[T]he existence of a permissive, but not compulsory, federal statute which may be preempted by contrary state law does not establish that the federal government is the source of authority for the clause." *Price,* 621 F.Supp. at 1249.

The *Beck* court also based its finding of government action on the fact that unions would not have the power to act as the exclusive bargaining representative of employees without the authorization of the federal labor statutes. *See Beck,* 776 F.2d at 1207–08. Nevertheless, the naked fact that a private entity is accorded monopoly status is insufficient alone to denominate that entity's action as government action. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351–52, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974); *see also Beck,* 776 F.2d at 1222 (Winter, *J.,* dissenting). Thus, the first aspect of the *Lugar* test for government action is not satisfied here where no right or privilege created by the government is the source of the appellants' alleged deprivation.

Moreover, neither the employer nor the union here can be said to be a state actor. Under *Lugar,* a person may be said to be a state actor "because he is a state official, because he has acted together with or has

obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." 457 U.S. at 937, 102 S.Ct. at 2753. Unlike the situation in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), where local government employees were subject to an agency shop agreement negotiated by their union and their governmental employer, here no government official was involved. Further, no significant aid from government officials has been demonstrated, nor, as was explained in *Kolinske,* has the government injected itself in any other way so as to make the conduct here chargeable to the state. *See* 712 F.2d at 479–80; *see also Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982) ("a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State").

Thus, in enacting the NLRA congress mapped out the background and parameters of possible private action, but required nothing with respect to the particular wrong complained of here. When a private party makes the ultimate choice within a range of options offered by the government, state action generally is not implicated. *See Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 164–65, 98 S.Ct. 1729, 1737–38, 56 L.Ed.2d 185 (1978). Since the union security clause was a product of private negotiations and was not attributable to the government, appellants' constitutional challenges were properly dismissed for lack of government action.

B. *Duty of Fair Representation.*

We note initially that there is a question under *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), whether appellants should have been required to exhaust their internal union remedies before bringing this action alleging a breach of the duty of fair representation. *Clayton* held that "courts have

discretion to decide whether to require exhaustion of internal union procedures." *Id.* at 689, 101 S.Ct. 2095.

Section 7 of the Constitution of the International Union here provides that "[a]ny member shall have the right to object to the expenditure of a portion of her/his dues money for activities or causes primarily political in nature", and prescribes a procedure for obtaining a rebate. Appellants completely bypassed this procedure, claiming that it was inadequate to redress their constitutional and statutory rights. Although in light of section 7 exhaustion may have been appropriate, at least with respect to the union's challenged political expenditures, in view of the disposition we have reached in this case we find it unnecessary to determine here the full reach of the exhaustion requirement. Appellants have contested more than just political expenditures by the union; they also object to being compelled to pay for nonpolitical expenditures such as litigation expenses unrelated to collective bargaining, union organization and recruitment expenditures, union insurance plans, strike funds, scholarship funds, and union publications.

Appellants assert that the union breached its duty of fair representation in several ways: first, by negotiating and executing the provision for a union security clause; second, by enforcing the security clause against members to compel full payment of dues and fees under threat of discharge; and third, by spending the compelled payments for purposes appellants find objectionable. Appellees, on the other hand, argue that the entire claim should be viewed as merely an internal union matter, and that such matters have been judicially excluded from the duty of fair representation. *See, e.g., Kolinske,* 712 F.2d at 481.

A union's duty of fair representation is implied from § 9(a) of the NLRA, 29 U.S.C. § 159(a) (1982), which grants unions exclusive representational status over members of the relevant bargaining unit. *See Kolinske,* 712 F.2d at 481; *see also DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n.14, 76 L.Ed.2d 476 (1983). When the statutory duty of fair representation arises, it is breached only when the "union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).

■ Since the scope of the duty is derived from the union's status as exclusive representative of the employees to the employer, *see Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 202–03, 65 S.Ct. 226, 231–32, 89 L.Ed. 173 (1944), the duty of fair representation can arise only when all three parties are involved. That is, "the duty of fair representation is co-extensive only with the power of exclusive representation." *Kolinske,* 712 F.2d at 481; *see Bass v. International Brotherhood of Boilermakers,* 630 F.2d 1058, 1062–63 (5th Cir. 1980). Given this, "[i]f a union does not serve as the exclusive agent for the members of the bargaining unit with respect to a particular matter, there is no corresponding duty of fair representation." *Freeman v. Local Union No. 135,* 746 F.2d 1316, 1321 (7th Cir.1984). Consequently, a matter that involves only the relationship between the union and its members and does not also involve the employer is viewed as an internal union matter that does not give rise to a duty of fair representation.

The principle that internal union matters are not encompassed within the duty of fair representation is exemplified in *Kolinske.* There, the union and the employer had negotiated a collective bargaining agreement containing an agency shop clause. When the union struck the employer, both members and nonmembers were eligible to receive strike benefits from the union if they took part in certain strike activities. Kolinske refused to do anything more than honor the picket line and was, therefore, denied strike benefits.

In Kolinske's subsequent suit the district court held that the union had breached its duty of fair representation. On appeal, however, the District of Columbia circuit court reversed, holding that "the duty of

fair representation extends only to matters involving an employee's dealings with his employer and ordinarily does not affect an employee's relationship with the union structure." 712 F.2d at 481. The court noted that the National Labor Relations Board and the courts usually do not include internal union matters among matters deemed to affect employment, except in situations in which that internal matter would have a substantial impact on the employee's relationship with the employer. Because the strike benefit rules of the union did not have such a substantial impact on Kolinske's relationship with his employer, they were held to be an internal union matter and not within the ambit of the statutory duty of fair representation.

Analogizing to *Kolinske*, the district court here held that the controversy over the use of dues and fees to support certain political and ideological causes is a purely internal matter. *See Price*, 621 F.Supp. at 1251. Appellants argue, however, that this is not a purely internal union matter because the employer is involved to the extent that, under the collective bargaining agreement, the employees will be fired if they do not pay. They contend that when an employee stands to lose his job the matter cannot be classified as merely an internal union matter.

The union counters that how it chooses to spend its funds is entirely an internal decision. However, in order to decide this case, we need not answer this question of classification because, even assuming that appellants' complaint over the union's use of their forced dues and fee payments did not qualify as an internal union matter and therefore would be subject to the duty of fair representation, there is nothing in the record—other than conclusory allegations by appellants—to show a breach of that duty; that is, that the union acted arbitrarily, discriminatorily, or in bad faith either in negotiating, executing, or enforcing the security clause, or in spending the resultant funds.

Undoubtedly, the mere negotiation of such a clause does not breach the duty of fair representation. Congressional authorization of such clauses in both § 2, Eleventh and § 8(a)(3) makes clear that they are properly part of our national labor policy. It strains logic to suggest that the union breached its duty of fair representation by negotiating into the collective bargaining agreement a statutorily authorized provision. Moreover, the Supreme Court has upheld the validity of a union shop clause under § 2, Eleventh, *see Hanson*, 351 U.S. at 238, 76 S.Ct. at 721; and, if such a clause is facially proper under § 2, Eleventh, which empowers private parties to override contrary state law, *a fortiori* it is valid under § 8(a)(3), which does not accord any similar power to override state law. Therefore, in the absence of some special circumstance not present, or even suggested, here, a union cannot be said to have acted arbitrarily, discriminatorily, or in bad faith merely because it has successfully negotiated a union security clause.

Similarly, the union cannot be said to have breached its duty of fair representation because it seeks to enforce the union security clause it has successfully negotiated. It would be absurd to suggest that parties to a collective bargaining agreement could negotiate but then could not enforce such a provision.

The sole remaining issue, then, is whether there is some breach of the union's duty of fair representation when it spends the compelled payments for purposes not approved by the appellants. We have adopted the standard that "a union may breach the statutory duty by arbitrary or irrational conduct, even in the absence of bad faith or hostility in the form of ill will or common law *malitia*". *Ryan v. New York Newspaper Printing Pressmen's Union*, 590 F.2d 451, 455 (2d Cir.1979). Applying that test to these expenditures, there is nothing to suggest arbitrary or irrational conduct by the union. The union's expenditures on organization and recruitment, insurance plans, strike funds, scholarship funds, union publications, and litigation unrelated to collective bargaining are for activities regularly engaged in by

modern unions. Since unions ordinarily and routinely spend money for those things that appellants contest, it is not arbitrary for this union to fund such activities despite appellants' objections.

Furthermore, there is no claim here that these expenditures were motivated by any discriminatory animus. Appellants do not allege that they are being treated differently from other union members, *cf. Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 797–98 (2d Cir.1974); on the contrary, their contention is that, in this instance, they *should* be treated differently because they disagree with the views of those who joined the union voluntarily rather than under the compulsion of the union security clause. Without some showing of discriminatory animus, however, resolution of internal disagreements on how union funds should be spent does not implicate the duty of fair representation.

Finally, there is no indication that the union acted in subjective bad faith in spending monies from an account to which appellants have contributed. Indeed, appellants' conclusory claim of bad faith is undercut, at least in part, by the fact that the international union has established a procedure for refunding to appellants and any other objectors monies spent on primarily political causes. Without deciding whether that particular procedure would be constitutionally adequate if government action had been found here, *see Ellis*, 104 S.Ct. at 1892–96, we note that the union's rebate program, at a minimum, tends to negate any inference of bad faith.

Hence, even assuming the statutory duty of fair representation applies here, appellants' claims do not establish that the union breached that duty. The judgment of the district court is therefore affirmed.